Opinion for the Court filed by Chief Judge SENTELLE.
Opinion concurring in part and dissenting in part filed by Circuit Judge ROGERS.
SENTELLE, Chief Judge:
In his 2003 State of the Union address, President George W. Bush reported that “[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa.”[1] Those sixteen words set off a series of events which resulted in the disclosure of Valerie Píame Wilson’s previously covert status at the Central Intelligence Agency. Valerie Píame Wilson and her husband, Joseph C. Wilson IV, have filed this action for damages to remedy the injuries they allege they suffered because of that disclosure. Defendants are the United States and four Executive Branch officials — Vice President Richard B. Cheney, former Senior Advisor to the President Karl C. Rove, former Assistant to the President and Chief of Staff to the Vice President I. Lewis “Scooter” Libby, Jr., and former Deputy Secretary of State Richard L. Ar-mitage. On motions to dismiss, the district court dismissed all claims. We affirm.
I. Background
We accept the factual allegations in the Amended Complaint as true for purposes of this appeal. See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).
During the spring of 2003, after President George W. Bush informed the Nation that “[t]he British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa,” there was much speculation in the press about whether the uranium allegation was credible and whether individuals at the White House were aware of questions about its credibility when the State of the Union address was given. On May 6, 2003, The New York Times published the first article questioning the veracity of the claim. That article by Nicholas Kristof cited as its source a “former ambassador” who had traveled to Niger in early 2002 and reported back to the Central Intelli *702 gence Agency (“CIA”) and the State Department that the uranium “allegations were unequivocally wrong and based on forged documents.” Am. Compl. ¶ 19b.
The Vice President’s Chief of Staff, I. Lewis “Scooter” Libby, Jr., contacted the State Department and asked for information about the Niger trip reported in The New York Times. The State Department’s Bureau of Intelligence and Research was directed to prepare a report about the travel and an Under Secretary kept Libby updated about its progress. The Under Secretary informed Libby that the former ambassador was Joseph Wilson. In June 2003, Libby was further advised by the Under Secretary and by a senior official at the CIA that Valerie Píame Wilson was Joseph Wilson’s wife, that she worked at the CIA, and that some thought that she helped plan Joseph Wilson’s trip to Niger. Vice President Cheney also told Libby that Valerie Píame Wilson worked at the CIA in the Counter-proliferation Division.
On June 12, 2003, The Washington Post published an article critical of the uranium claim based on the report of a retired ambassador who had traveled to Niger. Another article was published on June 19, 2003, in The New Republic. Entitled “The First Casualty: The Selling of the Iraq War,” the article alleged that the Vice President’s office had prompted the former ambassador’s trip to Niger and that, after the trip, administration officials “ ‘knew the Niger story was a flat-out lie.’ ” Am. Compl. ¶ 19k (quoting Spencer Ackerman & John B. Judis, The First Casualty: The Selling of the Iraq War, New Republic, June 30, 2003, at 14). Several news outlets carried the story on July 6, 2003. The New York Times published an Op-Ed by Joseph Wilson entitled “What I Didn’t Find in Africa;” The Washington Post published an article based on an interview with Joseph Wilson; and the Meet the Press television show included Joseph Wilson as a guest. Wilson confirmed the prior reports of his travel to Niger in 2002 and his doubts about the uranium claims and said that he had told the administration of his doubts upon his return from Niger.
The administration commenced an effort to rebut the Wilson allegations. In July, Libby talked to Judith Miller of The New York Times and to Matthew Cooper of Time magazine; Karl Rove talked to Matthew Cooper of Time magazine and to Chris Matthews, host of MSNBC’s “Hardball;” and Deputy Secretary of State Richard Armitage met with reporter Robert Novak. Armitage, who had learned of Valerie Wilson’s CIA employment from a State Department memo, told Novak that Valerie Wilson worked at the CIA on issues relating to weapons of mass destruction. Novak then wrote an article that was published in several newspapers, including The Washington Post and the Chicago Sun Times, on July 14, 2003. In the article, he wrote that “Wilson never worked for the CIA, but his wife, Valerie Píame, is an Agency operative on weapons of mass destruction.” Am. Compl. ¶ 14. That article, Valerie Wilson contends, “destroyed her cover as a classified CIA employee.” Id.
The Wilsons filed a complaint in district court seeking money damages from Vice President Cheney, Libby, and Rove for injuries allegedly suffered because of the disclosure of Valerie Wilson’s employment at the CIA. They amended their complaint on September 13, 2006, to add Armitage as a defendant. The Wilsons seek damages for constitutional violations under Bivens v. Six Unknovm Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and for *703 the invasion of their privacy under District of Columbia tort law.
The district court dismissed all of their claims. Wilson v. Libby, 498 F.Supp.2d 74 (D.D.C.2007). The court held that the Wilsons failed to state a Bivens claim upon which relief could be granted because special factors counsel against creating a Bivens remedy in this case. The Wilsons’ Bivens claims were based on alleged violations of their Fifth Amendment rights to equal protection of the laws, of Joseph Wilson’s First Amendment right to freedom of speech, and of Valerie Wilson’s Fifth Amendment rights to privacy and property, with each claim based on the disclosure of personal information covered by the Privacy Act, 5 U.S.C. § 552a. Because this Court has held that the Privacy Act is a comprehensive remedial scheme, Chung v. U.S. Dep’t of Justice, 333 F.3d 273, 274 (D.C.Cir.2003), aff'g in relevant part No. 00-1912, 2001 WL 34360430 (D.D.C. Sept. 20, 2001), and because the Supreme Court has held that the existence of a comprehensive remedial scheme precludes implication of Bivens remedies even where the scheme does not provide full relief, Wilkie v. Robbins, — U.S. -, 127 S.Ct. 2588, 2600-01, 2604-05, 168 L.Ed.2d 389 (2007); Schweiker v. Chilicky, 487 U.S. 412, 421-22, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); Bush v. Lucas, 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the district court concluded that it could not imply a Bivens remedy here. The court further concluded that creating a Bivens remedy in this case would be inappropriate because, if litigated, the case would inevitably require the disclosure of sensitive intelligence information.
The district court held that the invasion of privacy claim also required dismissal. The United States had intervened in the lawsuit with respect to the tort claim and had filed a certification pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(2), that, “at the time of the conduct alleged in the amended complaint the individual federal defendants ... were each acting within the scope of their employment as employees of the United States.” The court found that the Westfall Act certification was proper, meaning that the case must proceed solely against the United States under the Federal Tort Claims Act (“FTCA”), 28 U.S.C. §§ 2671-80. Because the Wilsons had not exhausted administrative remedies as required by the FTCA, the court dismissed the claim for lack of jurisdiction. The Wilsons appealed.
II. Jurisdiction
The “first and fundamental question” that we are “bound to ask and answer” is whether we have jurisdiction to decide this appeal. Bancoult v. McNamara, 445 F.3d 427, 432 (D.C.Cir.2006) (citing Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)) (internal quotation marks omitted). “ ‘The requirement that jurisdiction be established as a threshold matter “springs from the nature and limits of the judicial power of the United States” and is “inflexible and without exception.” ’ ” Id. (quoting Steel Co., 523 U.S. at 94-95, 118 S.Ct. 1003 (quoting Mansfield, C. & L.M. Ry. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884))). Therefore, we must “ ‘address questions pertaining to [our] jurisdiction before proceeding to the merits.’ ” Id. (quoting Tenet v. Doe, 544 U.S. 1, 6 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005)).
The Vice President argues that we do not have jurisdiction under the political question doctrine because this case involves the identity of a covert agent and thereby implicates foreign-policy and national-security decisions that are reserved *704 to the Executive Branch. We conclude that the allegations do not implicate the political question doctrine.
The political question doctrine “ ‘excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.’ ” Bancoult, 445 F.3d at 432 (quoting Japan Whaling Ass’n v. Am. Cetacean Soc’y, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)). The doctrine applies where, “[p]rominent on the surface” of the case is:
[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). “ ‘[UJnless one of these formulations is inextricable from the case at bar,’ we may not dismiss the claims as nonjusticiable under the political question doctrine.” Bancoult, 445 F.3d at 432-33 (quoting Baker, 369 U.S. at 217, 82 S.Ct. 691).
The doctrine does not apply here. While “decision-making in the fields of foreign policy and national security is textually committed to the political branches of government,” Schneider v. Kissinger, 412 F.3d 190, 194 (D.C.Cir.2005), the Wilsons have not challenged any foreign policy or national security decisions entrusted to the Executive Branch. They have instead challenged disclosures made by high-level executive branch officials when speaking with the press. The disclosures may have implicated national security by identifying a previously covert agent, but the lawsuit itself is not about national security in a manner requiring application of the political question doctrine. We therefore will proceed to the merits of the Wilsons’ claims.
III. ANALYSIS
The Wilsons argue that the district court erred in holding that special factors preclude implication of a Bivens claim and that the Government’s Westfall Act certification was proper. On each legal issue, our review is de novo. See Rasul v. Myers, 512 F.3d 644, 654 (D.C.Cir.2008).
A. Constitutional Claims
The Wilsons first contest the district court’s ruling that Bivens remedies are not available for their injuries. We agree with the district court that we cannot create a Bivens remedy because the comprehensive Privacy Act and the sensitive intelligence information concerns affiliated with this case preclude us from doing so.
1.
We have discretion in some circumstances to create a remedy against federal officials for constitutional violations, but we must decline to exercise that discretion where “special factors counsel[ ] hesitation” in doing so. See Bivens, 403 U.S. at 396, 91 S.Ct. 1999; Spagnola v. Mathis, 859 F.2d 223, 226 (D.C.Cir.1988) (en banc). In Bivens, the Court implied a remedy where there were no “ ‘special factors counselling hesitation in the absence of *705 affirmative action by Congress’ ” that required “the judiciary [to] decline to exercise its discretion in favor of creating damages remedies against federal officials.” Spagnola, 859 F.2d at 226 (quoting Bivens, 403 U.S. at 396, 91 S.Ct. 1999). Since Bivens, the Supreme Court has “recognized two more nonstatutory damages remedies, the first for employment discrimination in violation of the Due Process Clause, Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and the second for an Eighth Amendment violation by prison officials, Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980),” but “in most instances[, the Court has] found a Bivens remedy unjustified.” Wilkie v. Robbins, — U.S.-, 127 S.Ct. 2588, 2597, 168 L.Ed.2d 389 (2007). Indeed, in its “more recent decisions!, the Supreme Court has] responded cautiously to suggestions that Bivens remedies be extended into new contexts.” Chilicky, 487 U.S. at 421, 108 S.Ct. 2460.
One “special factor” that precludes creation of a Bivens remedy is the existence of a comprehensive remedial scheme. In Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the Court held that the federal civil service laws were a “special factor” that precluded additional Bivens remedies because they constituted “an elaborate remedial system that ha[d] been constructed step by step, with careful attention to conflicting policy considerations” and thereby reflected Congressional judgment about the type and magnitude of relief available. Id. at 388-90, 91 S.Ct. 1999. The scheme did not provide “complete relief’ to the plaintiff, but the Court held that the special factors inquiry does “not concern the merits of the particular remedy that was sought” or its completeness. Id. at 380, 388, 91 S.Ct. 1999. Rather, the doctrine “relate[s] to the question of who should decide whether such a remedy should be provided.” Id. at 380, 103 S.Ct. 2404. “[Convinced that Congress is in a better position to decide whether or not the public interest would be served” by the addition of legal liability, the Court refused to create new remedies under Bivens for the plaintiff in Bush. Id. at 390, 103 S.Ct. 2404.
The Supreme Court reiterated that a remedial statute need not provide full relief to the plaintiff to qualify as a “special factor” in Schweiker v. Chilicky, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). In Chilicky, “exactly as in Bush, Congress ha[d] failed to provide for ‘complete relief: respondents ha[d] not been given a remedy in damages for emotional distress or for other hardships suffered because of delays in their receipt of Social Security benefits.” Chilicky, 487 U.S. at 425, 108 S.Ct. 2460. But, the Court noted, “[t]he absence of statutory relief for a constitutional violation ... does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation.” Id. at 421-22, 108 S.Ct. 2460. Rather, “the concept of ‘special factors counselling hesitation in the absence of affirmative action by Congress’ ... inelude[s] an appropriate judicial deference to indications that congressional inaction has not been inadvertent.” Id. at 423, 108 S.Ct. 2460. Therefore, “[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration,” courts should not “create! ] additional Bivens remedies.” Id. Because “Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program,” the Court refused to question the legislative decision to exclude certain remedies from that program. Id. at 429, 108 S.Ct. 2460.
*706 Most recently, in Wilkie v. Robbins, — U.S.-, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007), the Court again held that the creation of a Bivens remedy is not required solely because there is no alternative statutory remedy. In Wilkie, there was no comprehensive scheme demonstrating “that Congress expected the Judiciary to stay its Bivens hand,” but the Court declined to imply a Bivens remedy nonetheless. Id. at 2600. The Court held that a remedy for allegedly harassing conduct of government officials would “come better, if at all, through legislation [because] ‘Congress is in a far better position than a court to evaluate the impact of a new species of litigation’ against those who act on the public’s behalf.” Id. at 2604-05 (quoting Bush, 462 U.S. at 389, 103 S.Ct. 2404). The Court’s “point ... is not to deny that Government employees sometimes overreach, for of course they do, and they may have done so here if all the allegations are true.” Id. at 2604. Instead, “[t]he point is the reasonable fear that a general Bivens cure would be worse than the disease.” Id. The Court concluded that authority to create a remedy should remain with Congress because Congress can “tailor any remedy to the problem perceived, thus lessening the risk of raising a tide of suits threatening legitimate initiative on the part of the Government’s employees.” Id. at 2605. Thus, the Court again made clear that there is no “automatic entitlement” to a Bivens remedy regardless of “what other means there may be to vindicate a protected interest.” Id. at 2597.
Consistent with Bush, Chilieky, and Wilkie, our Court sitting en banc has held that the availability of Bivens remedies does not turn on the completeness of the available statutory relief. In Spagnola v. Mathis, 859 F.2d 223 (D.C.Cir.1988), we interpreted Bush and Chilieky as “ma[king] clear that it is the comprehensiveness of the statutory scheme involved, not the ‘adequacy’ of specific remedies extended thereunder, that counsels judicial abstention.” Id. at 227. We held that “courts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has ‘not inadvertently’ omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve Bivens remedies.” Id. at 228. Quoting Chilieky, we explained that, “[i]n these circumstances, it is not for the judiciary to question whether Congress’ ‘response [was] the best response, [for] Congress is the body charged with making the inevitable compromises required in the design of a massive and complex ... program.’ ” Id. (quoting Chilicky, 487 U.S. at 429, 108 S.Ct. 2460).
Our Spagnola decision involved the comprehensive scheme established by the Civil Service Reform Act. 859 F.2d at 230. We have also found comprehensive remedial schemes in Title VII of the Civil Rights Act of 1964, see Ethnic Employees of Library of Congress v. Boorstin, 751 F.2d 1405, 1414-16 (D.C.Cir.1985), the Freedom of Information Act, see Johnson v. Executive Office for U.S. Attorneys, 310 F.3d 771, 777 (D.C.Cir.2002), the Veterans’ Judicial Review Act, see Thomas v. Principi, 394 F.3d 970, 975-76 (D.C.Cir.2005), and the Privacy Act, see Chung v. U.S. Dep’t of Justice, 333 F.3d 273, 274 (D.C.Cir.2003), aff'g in relevant part No. 00-1912, 2001 WL 34360430 (D.D.C. Sept. 20, 2001).
2.
The Wilsons concede that this Court has held that the Privacy Act, 5 U.S.C. § 552a, is a “special factor” that counsels hesitation in implying Bivens remedies. Appellants’ Br. at 17-18 (citing Chung, 333 *707 F.3d at 274); accord Downie v. City of Middleburg Heights, 301 F.3d 688, 698 (6th Cir.2002) (finding Privacy Act is a “comprehensive legislative scheme” that precludes additional Bivens remedies). But they contend that the Privacy Act should not be found “comprehensive” and preclusive of Bivens remedies here because three defendants in this case are exempted from its terms. The failure of the Privacy Act to provide complete relief to the Wilsons, however, does not undermine its status as a “comprehensive scheme” that stops us from providing additional remedies under Bivens.
The Privacy Act regulates the “ ‘collection, maintenance, use, and dissemination of information’ ” about individuals by federal agencies. Doe v. Chao, 540 U.S. 614, 618, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004) (quoting Privacy Act of 1974 § 2(a)(5), 88 Stat. 1896). It “authorizes civil suits by individuals ... whose Privacy Act rights are infringed,” Sussman v. U.S. Marshals Serv., 494 F.3d 1106, 1123 (D.C.Cir.2007), and provides for criminal penalties against federal officials who willfully disclose a record in violation of the Act, 5 U.S.C. § 552a(i)(l).
The claims asserted by the Wilsons are all claims alleging harm from the improper disclosure of information subject to the Privacy Act’s protections. The Privacy Act applies to information that is “about an individual,” that is stored in a system of records “under the control of any agency,” and that is “retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.” 5 U.S.C. § 552a(a)(4), (5). The amended complaint premises the Wilsons’ damages on the publication of Valerie Píame Wilson’s CIA employment in the Novak column. Am. Compl. ¶ 40. The publication was the result of a disclosure by Deputy Secretary of State Armitage of information about an individual contained in State Department records. Id. at ¶ 14.
Each claim in the Wilson complaint is based on this disclosure of Privacy Act protected information. In Count One, the Wilsons allege that Joseph Wilson’s First Amendment right to free speech was violated when the information was disclosed in retaliation for his speech. Count Two alleges that Valerie and Joseph Wilson’s Fifth Amendment rights to equal protection of the laws were violated by the disclosure of information because that disclosure treated them differently from others. Count Three alleges that Valerie Wilson’s Fifth Amendment right to privacy was violated when her personal information was publicly disclosed. Count Four alleges that Valerie Wilson’s Fifth Amendment right to property was violated when the information was disclosed because the disclosure eliminated the secrecy of her position which was essential to her employment. Thus, each Constitutional claim, whether pled in terms of privacy, property, due process, or the First Amendment, is a claim alleging damages from the improper disclosure of information covered by the Privacy Act.
It is true that the Wilsons cannot obtain complete relief under the Privacy Act because the Act exempts the Offices of the President and Vice President from its coverage. See 5 U.S.C. § 552a(b) (applying Privacy Act requirements to agencies); id. § 552a(a)(l) (adopting definition of “agency” from the Freedom of Information Act (FOIA)); Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 156, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980) (Office of the President is not an “agency” under FOIA); Judicial Watch, Inc. v. National Energy Policy Development Group, 219 F.Supp.2d 20, 55 (D.D.C.2002). Thus, even if the Wilsons can prove their allega *708 tions against Vice President Cheney, Rove, and Libby, they will not be remunerated for them. Nonetheless, our precedent is plain that the Wilsons are still not entitled to Bivens relief as to Vice President Cheney, Rove, or Libby, provided their omission from the remedial scheme was not inadvertent. See Spagnola, 859 F.2d at 228.
Congress did not inadvertently omit the Offices of the President and Vice President from the Privacy Act’s disclosure requirements. The Privacy Act explicitly defines “agency” by reference to FOIA, 5 U.S.C. § 552a(a)(l), which the Supreme Court has held, based on “unambiguous” legislative history, does not extend to the Office of the President, Kissinger, 445 U.S. at 156, 100 S.Ct. 960 (citing H.R.Rep. No. 93-1380 at 15 (1974)); see also Judicial Watch, 219 F.Supp.2d at 55 (concluding that the Vice President and his staff are not “agencies” for purposes of the FOIA). “There is every indication from the legislative history that the drafters of the Privacy Act, in choosing to apply the FOIA definition of ‘agency’ to the Privacy Act, were cognizant of the Conference Committee Report prepared in connection with the 1974 FOIA Amendments, which specifically provided that ‘the term [agency] is not to be interpreted as including the President’s immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.’ ” Jones v. Executive Office of the President, 167 F.Supp.2d 10, 19 (D.D.C.2001) (quoting H.R.Rep. No. 93-1380, at 15). This intentional omission of the Presidential and Vice Presidential offices from the comprehensive coverage of the Privacy Act requires us to deny the additional remedies to the Wilsons which they seek.
3.
The Wilsons make two principal arguments in attempting to distinguish their case from precedent. First, they rely on the Supreme Court’s decision in Carlson. In Carlson the Supreme Court stated that the right of victims of a constitutional violation to a Bivens remedy “may be defeated ... in two situations.” The Court defined the first as “when defendants demonstrate ‘special factors counsel-ling hesitation in the absence of affirmative action by Congress.’ ” 446 U.S. at 18, 100 S.Ct. 1468. The Supreme Court described the second as “when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective.” Id. at 18-19, 100 S.Ct. 1468. The Wilsons argue that the Bivens claim cannot be defeated here because there is no “equally effective alternative remedy.” Were we to look at Carlson standing alone, this argument might carry much weight. However, subsequent to Carlson, the Court clarified that there does not need to be an equally effective alternate remedy. Instead, “the decision whether to recognize a Bivens remedy may require two steps.” Wilkie, 127 S.Ct. at 2598. First, if there is an “alternative, existing process for protecting the interest,” then that is “a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.” Id. Even if there is no equally effective alternative remedy, the decision of whether to create “a Bivens remedy is a subject of judgment” that requires the court to “ ‘make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation.’” Id. (quoting Bush, 462 U.S. at 378, 103 S.Ct. 2404). In other words, an equally effective statutory remedy is a sufficient, but not essential, reason for us to *709 abstain from creating Bivens remedies. The presence of a comprehensive remedial scheme is also a sufficient reason for us to stay our hand.
Second, the Wilsons argue that other remedies have been available to the plaintiffs in cases where the Court denied a Bivens remedy. In Bush, the Court referred to the “comprehensive nature of the remedies currently available” under the civil service laws, 462 U.S. at 388, 103 S.Ct. 2404; in Chilicky, the Court described the Social Security Act as a “comprehensive statutory scheme,” 487 U.S. at 428, 108 S.Ct. 2460; and in Wilkie, the Court noted that the plaintiff could avail himself of a “patchwork” of remedies for some of his injuries, 127 S.Ct. at 2600. Here, in contrast, the Wilsons assert that they will never be able to obtain any remuneration for injuries allegedly suffered because of the actions of Vice President Cheney, Rove, and Libby if they cannot proceed under Bivens. Thus, they argue, they are like the plaintiffs in Davis and Bivens who were given a Bivens remedy because they had no other avenue of relief available to them. See Davis, 442 U.S. at 245, 99 S.Ct. 2264 (“There are available no other alternative forms of judicial relief.”); Bivens, 403 U.S. at 410, 91 S.Ct. 1999 (Harlan, J., concurring in the judgment) (“For people in Bivens’ shoes, it is damages or nothing”).
The first problem with this argument is that the Wilsons, unlike the plaintiffs in Davis and Bivens, can seek at least some remedy under the Privacy Act. At the least, as they concede, Valerie Wilson has a possible claim based on the disclosure by Deputy Secretary of State Armitage because the information disclosed about her and the agency involved in the disclosure are subject to the Privacy Act’s restrictions. Appellants’ Br. at 18 n. 3. So, while the Privacy Act may not provide the Wil-sons with full relief regarding the alleged disclosures, and provides Mr. Wilson with no relief, the Wilsons cannot contend that there is no possibility of relief at all under the statute for the disclosure of Privacy Act protected information.
The more significant flaw in the Wilsons’ argument is its focus on the necessity of a remedy at all. The special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue. In Spagnola, we held that a comprehensive statutory scheme precludes a Bivens remedy even when the scheme provides the plaintiff with “no remedy whatsoever.” 859 F.2d at 228 (quoting Chilicky, 487 U.S. at 423, 108 S.Ct. 2460). And the Supreme Court, in its most recent consideration of the issue, did not create a remedy even though there was no cause of action that the plaintiff could pursue to remedy injuries that resulted from a prolonged “course of dealing as a whole.” Wilkie, 127 S.Ct. at 2600-01, 2604-05. The pertinent inquiry is “the question of who should decide whether such a remedy should be provided,” Bush, 462 U.S. at 380, 103 S.Ct. 2404, not whether there is a remedy. Indeed, it is where Congress has intentionally withheld a remedy that we must most refrain from providing one because it is in those situations that “appropriate judicial deference” is especially due to the considered judgment of Congress that certain remedies are not warranted. See Chilicky, 487 U.S. at 423, 108 S.Ct. 2460. That deference must be given whether Congress has chosen to exclude a remedy for particular claims, as in Bush and Chilicky, or from particular defendants, as here. Provided “Congress has put in place a comprehensive system to administer public rights, has ‘not inadvertently’ omitted damages remedies for certain claimants, and has not plainly ex *710 pressed an intention that the courts preserve Bivens remedies,” Spagnola, 859 F.2d at 228, we cannot create additional remedies.
Therefore, because Congress created a comprehensive Privacy Act scheme that did not inadvertently exclude a remedy for the claims brought against these defendants, we will not supplement the scheme with Bivens remedies.
4.
We also cannot ignore that, if we were to create a Bivens remedy, the litigation of the allegations in the amended complaint would inevitably require judicial intrusion into matters of national security and sensitive intelligence information. The decision of whether to create a Bivens remedy involves our judgment and “weighing [of] reasons for and against the creation of a new cause of action, the way common law judges have always done.” Wilkie, 127 S.Ct. at 2600. Pertinent to that judgment are the difficulties associated with subjecting allegations involving CIA operations and covert operatives to judicial and public scrutiny.
There is no dispute on appeal that a Bivens remedy in this case is not precluded by the Intelligence Identities Protection Act of 1982 (“UPA”), 50 U.S.C. §§ 421-26, or by the justiciability doctrine of Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1875). The IIPA is not a “comprehensive remedial scheme” for purposes of the special factors analysis because it is a purely criminal statute that only authorizes criminal prosecution of those who intentionally disclose the identity of a covert agent. See 50 U.S.C. § 421. And the doctrine of Totten, which precludes suits “against the Government based on covert espionage agreements,” Tenet v. Doe, 544 U.S. 1, 3, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005), does not apply where the suit is “brought by an acknowledged (though covert) employee of the CIA,” id. at 10, 125 S.Ct. 1230. Nonetheless, the concerns that underlie the protective restrictions of the IIPA and the Totten doctrine are valid considerations in the Bivens analysis and weigh against creating a remedy in this case. As the Supreme Court has recognized, “ ‘[e]ven a small chance that some court will order disclosure of a source’s identity could well impair intelligence gathering and cause sources to “close up like a clam.”’” Id. at 11, 125 S.Ct. 1230 (quoting CIA v. Sims, 471 U.S. 159, 175, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985)). We will not create a cause of action that provides that opportunity.
Litigation of the Wilsons’ allegations would inevitably require an inquiry into “classified information that may undermine ongoing covert operations.” See Tenet, 544 U.S. at 11, 125 S.Ct. 1230. The amended complaint alleges that the disclosure of Valerie Píame Wilson’s identity “impaired ... her ability to carry out her duties at the CIA,” Am. Compl. ¶ 43, increased the risk of violence to her and her family, id. at ¶ 42, and subjected her to treatment different from that given other similarly situated agents, id. at ¶¶ 51-52. We certainly must hesitate before we allow a judicial inquiry into these allegations that implicate the job risks and responsibilities of covert CIA agents. In cases involving covert espionage agreements, “[t]he state secrets privilege and the more frequent use of in camera judicial proceedings simply cannot provide the absolute protection [the Court] found necessary in enunciating the Totten rule.” Tenet, 544 U.S. at 11, 125 S.Ct. 1230. Here, although Totten does not bar the suit, the concerns justifying the Totten doctrine provide further support for our decision that a Bivens cause of action is not warranted.
*711 For all the above-stated reasons, we will not imply a Bivens remedy. The district court’s decision in this regard is affirmed.
B. Tort Claim
The Wilsons also contest the district court’s dismissal of their tort claim. With respect to the tort claim, the United States made a certification pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the “Westfall Act”), 28 U.S.C. § 2679, that “at the time of the conduct alleged in the amended complaint the individual defendants ... were acting within the scope of their employment as employees of the United States.” The certification carries a rebuttable presumption that the employee has absolute immunity from the lawsuit and that the United States is to be substituted as the defendant. Id. § 2679(d); Osborn v. Haley, 549 U.S. 225, 127 S.Ct. 881, 887-88, 166 L.Ed.2d 819 (2007); Council on Am. Islamic Relations (CAIR) v. Ballenger, 444 F.3d 659, 662 (D.C.Cir.2006). If the presumption is not rebutted in this case, the case must be dismissed because the Wilsons have not exhausted their administrative remedies as required to pursue a claim against the United States pursuant to the Federal Tort Claims Act. See 28 U.S.C. § 2675(a).
The Wilsons seek to rebut the certification’s claim that the defendants were working within their scope of employment when the disclosures were made. To determine whether an employee was acting within the scope of employment under the Westfall Act, we apply the respon-deat superior law in the state in which the alleged tort occurred. CAIR, 444 F.3d at 663. District of Columbia law, which applies in this case, defines the scope of employment in accordance with the Restatement (Second) of Agency (1958) (“Restatement”). Id. (citing Moseley v. Second New St. Paul Baptist Church, 534 A.2d 346, 348 n. 4 (D.C.1987)). The Restatement provides, in pertinent part, that:
Conduct of a servant is within the scope of employment if, but only if:
(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master, and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
Restatement § 228(1); see CAIR, 444 F.3d at 663. “ ‘[T]he test for scope of employment is an objective one, based on all the facts and circumstances.’ ” Id. (quoting Weinberg v. Johnson, 518 A.2d 985, 991 (D.C.1986)). “Although scope of employment is generally a question for the jury, it ‘becomes a question of law for the court, however, if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment.’ ” Id. (quoting Boykin v. District of Columbia, 484 A.2d 560, 562 (D.C.1984)).
The Wilsons argue that the disclosure of a covert agent’s identity cannot fall within an employee’s scope of employment with the United States because the disclosure is unlawful and threatens the security of the nation, its covert agents, and its intelligence-gathering functions. But, as we explained in CAIR, “[t]his argument rests on a misunderstanding of D.C. scope-of-employment law (not to mention the plain text of the Westfall Act), which directs courts to look beyond alleged intentional torts themselves” to the underlying conduct in determining whether that conduct was within the scope of employment. 444 F.3d at 664. As a result, an employ *712 ee’s scope of employment “ ‘is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer’s behalf.’ ” Id. (quoting Weinberg, 518 A.2d at 992). We noted in CAIR that D.C. courts have concluded that “a reasonable juror could find that a laundromat employee acted within scope of employment when he shot a customer during a dispute over missing shirts,” id. (citing Johnson v. Weinberg, 434 A.2d 404, 409 (D.C.1981)), and that a “jury reasonably found that a mattress deliveryman acted within [the] scope of employment when he assaulted and raped a customer following a delivery-related dispute,” id. (citing Lyon v. Carey, 533 F.2d 649, 652 (D.C.Cir.1976)).
We have since held, under D.C. scope of employment law, that the alleged “authorization, implementation and supervision of torture” was within the scope of employment of military officers who interrogated detainees at the United States Naval Base at Guantanamo Bay, Cuba. Rasul v. Myers, 512 F.3d 644, 656-60 (D.C.Cir.2008). In Rasul, the allegation that employees had engaged in “serious criminality” while interrogating detainees did not change the result because “the detention and interrogation of suspected enemy combatants [was] a central part of the [employees’] duties as military officers charged with winning the war on terror.” Id. at 658-60. Because “the detention and interrogation of suspected enemy combatants [was] the type of conduct the defendants were employed to engage in,” id. at 658, the “alleged tortious conduct was incidental to the defendants’ legitimate employment duties,” id. at 659, and “allegations of serious criminality d[id] not alter our conclusion that the defendants’ conduct was incidental to authorized conduct,” id. at 660.
Even more to the point for purposes of this case, we held in CAIR that a congressman’s allegedly defamatory statement made during a press interview was within the scope of his employment because “[s]peaking to the press during regular work hours in response to a reporter’s inquiry falls within the scope of a congressman’s ‘authorized duties.’ ” Id. A congressman’s “ability to do his job as a legislator effectively is tied, as in this case, to the Member’s relationship with the public and in particular his constituents and colleagues in the Congress.” Id. at 665. Thus, we held that the congressman’s statement to the press was “of the kind he is employed to perform” and “actuated, at least in part, by a purpose to serve the master.” Id. at 664-66 (quoting Restatement § 228(1)).
Here, the Wilsons allege that the defendants spoke to the press in order to diffuse Joseph Wilson’s criticism of the Executive’s handling of pre-war intelligence. Am. Compl. ¶¶ 2-3. It can hardly be disputed that such discussions were of the type that the defendants were employed to perform. Even the Wilsons agree that “[o]f course, the defendants may discredit public critics of the Executive Branch.” Appellants’ Br. at 33. The conduct, then, was in the defendants’ scope of employment regardless of whether it was unlawful or contrary to the national security of the United States. Therefore, we agree with the district court that the Wilsons’ arguments about the illegality and impropriety of the alleged conduct are misplaced. The government’s seope-of-employment certification is proper, and the district court’s dismissal of the tort claim is affirmed.[2]
*713 IY. Conclusion
Because the Wilsons have failed to state constitutional Bivens claims for which relief may be granted and have failed to exhaust their administrative remedies as required to pursue a tort claim against the United States, we affirm the judgment of the district court dismissing the Wilsons’ amended complaint in its entirety.[3]

. George W. Bush, U.S. President, State of the Union, Address Before the Nation (Jan. 23, 2003) (transcript available at http://www. whitehouse.gov/news/releases/2003/01/ 20030128-19.html).

. We further agree with the district court that further discovery is not warranted to determine precise times and locations of the defendants' conversations with the press. Even if *713 some conversations took place on Sunday or occurred off White House property as the Wilsons contend and seek to discover, the conversations would still have occurred within the “time and space” of employment of the high-level Executive Branch employees sued here. Neither the Vice President, his chief of staff, nor a close advisor to the President punches out of work at the end of the day or when he leaves White House property.

. Because our decision, based on the grounds considered by the district court, results in the dismissal of all claims against the Vice President of the United States, we need not, and do not, consider his alternate claim for absolute Vice-Presidential immunity.