Opinion for the Court filed by Chief Judge SENTELLE.
Dissenting opinion filed by Circuit Judge ROGERS.
SENTELLE, Chief Judge:
Appellee, a former employee of the Library of Congress, brought this action against, inter alia, his former supervisor, Daniel Mulhollan, alleging that his termination for publication of articles critical of high-level public officials violated the First and Fifth Amendments of the Constitution and entitled him to damages relief under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Appellant Mulhollan moved to dismiss, arguing that a Bivens action is not available under the circumstances of this case and that he is entitled to qualified immunity. The district court denied the motion to dismiss, and Mulhollan filed the current appeal. Because we conclude that the courts should not imply a new form of Bivens action on the facts of this case, we reverse the order of the district court denying dismissal.
I. Background
Upon review of a district court’s ruling on a motion to dismiss, we, like the district court, accept as true the well-pleaded factual allegations of the complaint. Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C.Cir.2000). Therefore, the following recitation of facts implies no decision on our part as to the accuracy of the allegations. In December 2008, the Congressional Research Service (CRS), the public-policy-research arm of Congress and a department of the Library of Congress, hired appellee Davis as Assistant Director of its Foreign Affairs, Defense, and Trade Division subject to a mandatory, one-year probationary period. That division provides research and analytical services to congressional committees responsible for foreign affairs; international trade and finance; defense policy and arms control; and defense budget, manpower, and management. As Assistant Director, Davis was responsible for leading, planning, directing, and evaluating the research and analytical activities of the division.
During his tenure as Assistant Director, Davis publicly criticized the system of military commissions created to prosecute suspected terrorists held at Guantanamo Bay Naval Base, Cuba, a system with which he had become familiar while serving as Chief Prosecutor there until October 2007. While employed by CRS, Davis voiced his criticisms of the system at a Human Rights Watch dinner, in a BBC documentary, at a conference at Case Western Reserve University Law School, and in a law review article in connection with the conference. He also spoke about his views at a Lawyers Association of Kansas City meeting after accepting an award for speaking out against what he characterized as the politicization of the military-commissions system.
On November 11, 2009, as Davis’s probationary year neared its end, he published opinion pieces in both the Wall Street Journal and the Washington Post criticizing Attorney General Eric Holder and the Obama administration for choosing to prosecute some Guantanamo detainees in federal courts and others in military commissions. Davis called this decision “a mistake” and “double-standard justice” that “we would condemn if *380 ... applied to us.” The Post piece challenged the contention of former Attorney General Michael Mukasey that “the decision to try Guantanamo detainees in federal courts comes down to a choice between protecting the American people and showcasing American justice.” Davis wrote that Mukasey’s statement, which expressed concern for the security of people where detainees would be tried, was “fear-mongering worthy of former vice president Dick Cheney.” Neither editorial included a disclaimer that it represented Davis’s personal views and not those of CRS or the Library of Congress.
The evening before the publication of the two opinion pieces, Davis e-mailed appellant Mulhollan, the Director of CRS, and informed him of the impending publication of the two opinion pieces. Mulhol-lan responded by e-mail, questioning Davis’s judgment and his ability to continue serving as Assistant Director. After the pieces were published, Mulhollan told Davis that the opinion pieces damaged Davis’s ability to lead his division in providing objective, nonpartisan analysis. He also asked how members of Congress could trust Davis’s leadership on military-commissions issues given his public opposition to current policy; how Republicans would view his objectivity after his attack on Dick Cheney; and how Davis could properly counsel employees who failed to comply with the CRS outside-speech policy, which Mulhollan believed Davis had violated. On November 20, 2009, Mulhol-lan notified Davis that he would be removed from his probationary appointment as Assistant Director. Mulhollan provided Davis with a thirty-day appointment as Mulhollan’s special advisor to provide time to look for other employment, after which time Davis was separated from CRS.
Davis then filed the current action against appellant, as well as James Billing-ton, the Librarian of Congress, seeking declaratory and injunctive relief, and seeking damages against Mulhollan for violation of his constitutional rights under the First and Fifth Amendments, asking the court to imply a remedy under Bivens. Mulhollan moved to dismiss, both on the basis of qualified immunity and on the theory that the court should not imply a Bivens remedy for the discharge of a civil-service employee. Because we agree that there is no available Bivens remedy, we will not reach the question of qualified immunity but will reverse the district court’s denial of the motion to dismiss.
II. Analysis
We have jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine. It is a well-established application of that doctrine that “a district court’s denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable ‘final decision’ within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment.” Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Because the defense of qualified immunity from a Bivens damages action “directly implicate^]” the antecedent question whether to recognize that Bivens action at all, our jurisdiction extends to that question as well. See Wilkie v. Robbins, 551 U.S. 537, 549 & n. 4, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (internal quotation marks omitted). We review the district court’s legal conclusions de novo. Wilson v. Libby, 535 F.3d 697, 704 (D.C.Cir.2008).
A.
In Bivens, the Supreme Court determined that under appropriate circumstances the federal courts possess the dis *381 cretion to create remedial actions against federal officials for violations of constitutional rights, even though Congress has not expressly authorized those specific remedies by statute. See Bush v. Lucas, 462 U.S. 367, 373-74, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). Beginning with Bivens, the Supreme Court has drawn upon this power in three instances to create a nonstatutory action for money damages against federal officials for constitutional violations. See Bivens, 403 U.S. 388, 91 S.Ct. 1999 (Fourth Amendment violation by federal agents); Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (employment discrimination in violation of the Due Process Clause); Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (Eighth Amendment violations by prison officials).
For the most part, though, the Court has “responded cautiously” to requests for new “Bivens ” remedies. Schweiker v. Chilicky, 487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). The decision whether to recognize a new damages remedy is not about ensuring that every violation of a constitutional right is vindicated. Rather, the Bivens inquiry is a “judgment about the best way to implement a constitutional guarantee.” Robbins, 551 U.S. at 550, 127 S.Ct. 2588. As the Supreme Court has made clear, in most instances the judgment has been that Congress, not the judicial branch, is in the best position to prescribe the scope of relief available for the violation of a constitutional right. The Supreme Court has applied this analysis in a context paralleling the facts before us. Specifically, the Court in Robbins stated: “We have accordingly held against applying the Bivens model to claims of First Amendment violations by federal employers.... ” 551 U.S. at 562, 127 S.Ct. 2588 (citing Bush, 462 U.S. 367, 103 S.Ct. 2404); see also Chap-pell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); Chilicky, 487 U.S. 412, 108 S.Ct. 2460. In explaining its reluctance to create new causes of action for federal employees alleging violation of their constitutional rights, the Supreme Court recognized that “Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service.” Bush, 462 U.S. at 389, 103 S.Ct. 2404. The Court further explained that Congress has “developed considerable familiarity with balancing governmental efficiency and the rights of employees,” and that “it also may inform itself through factfinding procedures such as hearings that are not available to the courts.” Id.
In keeping with the Supreme Court’s recognition of Congress’s primary role, we have held that the courts will not imply a Bivens remedy where Congress has adopted a “comprehensive remedial scheme.” Wilson, 535 F.3d at 705. In Wilson, we followed the approach established by the Supreme Court in Bush v. Lucas, a case in which a NASA rocket scientist sought damages for First Amendment violations based on an alleged retaliatory demotion. The Court held that the statutory scheme governing federal civil-service employees — “an elaborate remedial system that has been constructed step by step, with, careful attention to conflicting policy considerations” — qualified as a special factor that precluded creation of a Bivens remedy for violations of a federal employee’s First Amendment rights. Bush, 462 U.S. at 388-89, 103 S.Ct. 2404. Although the existing scheme did not afford complete relief to the plaintiff, the scope of relief Congress chose to implement in that system reflected a congres *382 sional policy judgment “informed by a thorough understanding of the existing regulatory structure and the respective costs and benefits that would result from the addition of another remedy” to the civil-service system. Id. at 388, 103 S.Ct. 2404. Recognizing that “Congress is in a far better position than a court” to make that policy judgment, the Court “decline[d] to create a new substantive legal liability without legislative aid and as at the common law.” Id. at 389-90, 103 S.Ct. 2404 (internal quotation marks and citations omitted). In declining to fashion a new Bivens remedy, the Court in Bush explained that the relevant question about a comprehensive remedial scheme for purposes of special-factors analysis — -whether the scheme represents an informed congressional judgment about what relief should be available — “cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.” Id. at 388, 103 S.Ct. 2404.
The Court again dealt with the topic of a comprehensive scheme constituting a special factor in a Bivens analysis in Schweiker v. Chilicky. In Chilicky, the Court made it even clearer that whether the scheme affords a plaintiff relief for his specific injuries is not determinative of this inquiry. The plaintiffs in Chilicky sought money damages against state and federal officials for violations of their due process rights that resulted in the termination of the plaintiffs’ Social Security disability benefits. The Social Security Act provided no separate remedy for unconstitutional conduct that leads to the wrongful denial of benefits. Yet the Court declined to create a Bivens remedy to relieve these unredressed injuries, discerning no relevant distinction between the civil-service system in Bush and the Social Security Act’s remedial scheme. Chilicky, 487 U.S. at 424-25, 108 S.Ct. 2460. Indeed, “The absence of statutory relief for a constitutional violation ... does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation.” Id. at 421-22, 108 S.Ct. 2460. To the contrary, so long as “the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration,” the Court would not add a Bivens remedy to the mix. Id. at 423, 91 S.Ct. 1999. Again, deference to the informed judgment of Congress was the key: “Congress is the body charged with making the inevitable compromises required in the design of a massive and complex welfare benefits program,” and it fulfilled that charge. Id. at 429, 91 S.Ct. 1999. Congress’s choice to leave the remedy sought by the plaintiffs out of that complex program was not a legal basis for judicially revising Congress’s considered policy judgment. Id.
In Wilson, as we had earlier done in Spagnola v. Mathis, 859 F.2d 223 (D.C.Cir.1988), we applied the Supreme Court’s precedents from Chilicky and Bush. Although in both Wilson and Spag-nola the comprehensive remedial scheme did not provide the relief the plaintiff was seeking, “it is the comprehensiveness of the statutory scheme involved, not the ‘adequacy’ of specific remedies extended thereunder, that counsels judicial abstention.” Spagnola, 859 F.2d at 227. At bottom, then, “courts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has ‘not inadvertently’ omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve Bivens remedies.” Id. at 228. The presence of these indicia of an informed congressional judgment is sufficient to stay the judiciary’s hand in favor of Congress’s *383 decision. Because the CSRA met these requirements, the Spagnola Court held that “the creation of a Bivens remedy for civil service employees and applicants who advance constitutional challenges to federal personnel actions,” id. at 230, was foreclosed, even though the remedies available to the plaintiffs were “not so complete,” id. at 226.
Wilson v. Libby explicitly rejected the notion that a comprehensive scheme must include some remedy for the plaintiff before the scheme can constitute a special factor that precludes creation of a Bivens remedy. A CIA employee, Valerie Píame Wilson, and her husband, Joseph Wilson, brought a Bivens action against then-Vice President Cheney, his Chief of Staff, and the President’s Deputy Chief of Staff based on alleged improper disclosure of information by those individuals. The disclosure blew Mrs. Wilson’s cover as a CIA operative. The Wilsons alleged a violation of Mr. Wilson’s free speech rights based on retaliatory disclosure of the information; violations of both his and Mrs. Wilson’s equal protection rights; a violation of her right to privacy based on the public disclosure of her personal information; and a violation of her Fifth Amendment property rights based on the disclosure’s effective elimination of her position through destruction of its secrecy.
None of these claims were cognizable under the Privacy Act. Mrs. Wilson’s claims were barred by the Privacy Act’s exemption of the Offices of the President and Vice President — which included the three defendants — from its coverage. The Act provided Mr. Wilson with no relief at all; only the person whose records are actually disclosed may bring a claim under the Privacy Act. Still, we declined to create a Bivens remedy for these alleged constitutional violations. We first pointed out that the Wilsons’ contention that they had no possibility of relief was inaccurate because Mrs. Wilson had a possible claim against the Deputy Secretary of State. Even if they were correct that the Act provided at least Mr. Wilson with no relief whatsoever, they were incorrect to “focus on the necessity of a remedy at all.” Wilson, 535 F.3d at 709. We reiterated that “[t]he special factors analysis does not turn on whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue.” Id. Instead, the correct inquiry continues to be the one put forth in Bush: “the question of who should decide whether such a remedy should be provided.” Id. (citing Bush, 462 U.S. at 380, 103 S.Ct. 2404 (internal quotation marks omitted)). Deference to Congress to make that decision is “especially due” when it “intentionally withheld” a remedy, which shows “the considered judgment of Congress that certain remedies are not warranted.” Id. That deference is owed “whether Congress has chosen to exclude a remedy for particular claims, as in Bush and Chilicky, or from particular defendants,” as was the case in Wilson. Id.
B.
1.
The primary question before us in this case then is whether the CSRA is a “comprehensive remedial scheme,” ie., a scheme that reflects a considered congressional judgment about which remedies should be available for claims that fall within its ambit. It qualifies as such “when Congress has put in place a comprehensive system to administer public rights, has ‘not inadvertently’ omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve Bivens remedies.” Spagnola, 859 F.2d at 228. That being established, we give “appropriate judicial *384 deference” to Congress’s judgment on the matter, treating the comprehensive scheme as a special factor that precludes the creation of a Bivens remedy. Chilicky, 487 U.S. at 423, 108 S.Ct. 2460.
No one contests that the CSRA is a “comprehensive system to administer public rights.” Davis admits this much, and indeed, that conclusion was necessary to this court’s holding in Spagnola that the CSRA was a special factor precluding the creation of a Bivens remedy for the plaintiffs in that case. See Spagnola, 859 F.2d at 228; see also Bush, 462 U.S. at 385-86, 103 S.Ct. 2404. Nor has Congress provided any suggestion, much less a “plainly expressed” intent, that Bivens remedies should be preserved for claimants in Davis’s shoes.
Further, Congress’s choice to omit damages remedies for claimants in Davis’s posture was a deliberate one — or as we have put it before, Congress has “not inadvertently” omitted these damages remedies. A review of the CSRA’s remedial scheme as it relates to Davis and most other civil-service members not employed by an agency under the executive branch for purposes of the CSRA makes it clear that their general excision from the remedial protections available through that scheme was in fact conscious and “not inadvertent.”
The CSRA defines the “civil service” as “all appointive positions” in all three branches of government. 5 U.S.C. § 2101. The civil service is then divided into three categories: the Senior Executive Service, the competitive service, and the excepted service. The Senior Executive Service includes certain high-level executive positions. See id. § 3132(a)(2). The competitive service, generally speaking, includes “all civil service positions in the executive branch,” excluding positions that require Senate confirmation and those Congress specifically excludes by statute. Id. § 2102. It also includes positions in certain named categories if Congress specifically includes any particular positions in those categories by statute. Id. Finally, the excepted service contains the remainder of the civil-service positions — those positions not in the competitive service or the Senior Executive Service. Id. § 2103.
Congress plainly included employees in Davis’s former position in the “civil service” as defined by the CSRA. Davis was an appointed employee with CRS, part of the Library of Congress. The Library of Congress is not in the executive branch for purposes of § 2102, nor are Library of Congress employees specifically included in the competitive service by statute. Therefore, within the CSRA’s definitional structure, Davis was a member of the excepted service.
Congress deliberately included Library of Congress employees in the “civil service” governed by the CSRA. Then, just as deliberately, Congress chose to limit the beneficiaries of the CSRA’s remedial protections in large part to non-probationary employees in the executive branch. Specifically, three chapters of the CSRA govern personnel actions taken against civil-service employees and the remedies available to those employees. With only inconsequential exceptions, none of them provide procedural rights or remedial measures for civil-service employees of non-Executive agencies, which include the Library of Congress. Moreover, the primary set of protections against arbitrary adverse employment actions, contained in Chapter 75, is not available to employees who are on probationary status. This leaves Davis, an employee of the Library of Congress on probationary status, without recourse under the CSRA for adverse actions taken against him.
*385 In each of the three CSRA chapters governing personnel actions, the unambiguous language Congress used to delineate which civil-service employees would be eligible for the remedial protections provided demonstrates that the exclusion of probationary and CRS employees was deliberate. First, under Chapter 43, Congress provided procedural protections and rights of appeal in the context of performance reviews to “employees,” which are defined in Chapter 43 as individuals “employed in or under an ‘agency.’ ” Id. § 4301(2). “Agency” is in turn defined in Chapter 43 as “an Executive agency” and the Government Printing Office (GPO), excluding certain entities not pertinent here. Id. § 4301(1). These definitions reflect an intentional choice to leave civil-service members not employed by the statutorily referenced Executive agencies — including employees of CRS, see id. § 7103(a)(3) (listing the Library of Congress separately from “Executive agency”)- — ineligible for these remedial protections.
Chapter 75 of the CSRA, which governs adverse actions taken against civil-service employees for the “efficiency of the service,” excises probationary and non-Executive agency employees from its procedural protections in similar fashion. The protections available to civil-service members for minor adverse actions (suspensions shorter than 14 days) are limited to “employees,” which are defined as individuals in the competitive service not on probationary status. Id. § 7501(1). The protections against major adverse actions (removal, longer suspensions, pay or grade reduction, or furlough) are also limited to “employees,” which are defined more broadly under that subsection as (A) members of the competitive service not on probationary status; (B) preference-eligible members of the excepted service who have served at least a year in an Executive agency (or in the Postal Service or the Postal Regulatory Commission); or (C) non-preference-eligible, non-probationary members of the excepted service who have served two years or more in an Executive agency. See id. § 7511(a)(1). These carefully crafted definitions set up clear demarcations between the categories of civil-service members eligible and ineligible for the CSRA’s main body of procedural protections against adverse employment actions, and the ineligible group includes ex-eepted-service employees of non-Executive agencies and probationary employees.
Chapter 23, which establishes the principles of the merit system of civil-service employment, forbids an agency from engaging in certain “prohibited personnel practices,” id. §§ 2301-02. Each section is limited almost exclusively to employees of Executive agencies using an approach nearly identical to that used in Chapter 43. The section listing the basic principles of the merit system applies to “an Executive agency” and the Government Printing Office. Id. § 2301. The section listing the specific prohibited personnel actions defines “personnel action” as an action “with respect to an employee in, or applicant for, a covered position in an ‘agency,’ ” which is again defined as an Executive agency and the Government Printing Office (excluding government corporations, intelligence agencies, and the Government Accountability Office). Id. § 2302.
The careful categorization of the subsets of civil-service employees eligible for each part of the CSRA’s remedial scheme speaks for itself — Congress’s decisions about which civil-service members would be eligible for these protections were not made inadvertently. Our discussion of the same inquiry in Wilson reflects this. There, we held that Congress was aware that the definition of “agency” it chose would exclude the Offices of the President and Vice President from the Privacy Act’s *386 disclosure requirements (leaving the Wil-sons without claims against the three defendants, who were employed with those offices). That awareness was sufficient to deem the omission “intentional” and “not inadvertent.” Wilson, 535 F.3d at 708. Here, the unambiguous use of the narrowing term “Executive agency” — a term which plainly does not contain the Library of Congress within the meaning of the statute, see 5 U.S.C. § 7103(a)(3) — and the express exclusion of probationary employees from the “agencies” and types of “employees” subject to the CSRA’s remedial protections evidences an explicit congressional design for the subsets of civil-service employees that would and would not have access to those protections. We are satisfied that Congress omitted the subset of employees that includes Davis from the remedial protections of the CSRA every bit as intentionally as it omitted the Offices of the President and Vice President from Privacy Act requirements in Wilson. And as we wrote in Wilson, “it is where Congress has intentionally withheld a remedy that we must most refrain from providing one because it is in those situations that ‘appropriate judicial deference’ is especially due to the considered judgment of Congress that certain remedies are not warranted.” Wilson, 535 F.3d at 709 (citing Chilicky, 487 U.S. at 423, 108 S.Ct. 2460).
In short, all indications suggest Congress has made an informed judgment about which remedies should be available to particular classes of civil-service employees. The CSRA is a comprehensive system to administer public rights; Congress consciously, “not inadvertently” omitted remedies for civil-service members employed in or under the Library of Congress; and nothing suggests Congress intended that courts preserve Bivens remedies for such claimants. These indications are sufficient to require our deference to Congress as “the body charged with making the inevitable compromises required in the design of a massive and complex ... program.” Chilicky, 487 U.S. at 429, 108 S.Ct. 2460.
2.
Davis’s argument to the contrary rests on the idea that in no other case has the Supreme Court or this court refused to recognize a Bivens remedy for a plaintiff based on the existence of a remedial scheme that provides no relief whatsoever for the alleged constitutional violations. This is incorrect. To begin with, the Chil-icky plaintiffs sought a Bivens remedy against state and federal officials for “emotional distress and for loss of food, shelter and other necessities proximately caused by [the officers’] denial of [disability] benefits without due process.” 487 U.S. at 419, 108 S.Ct. 2460 (internal quotation marks omitted). The Act “makes no provision for remedies in money damages against officials responsible for unconstitutional conduct that leads to the wrongful denial of benefits.” Id. at 424, 108 S.Ct. 2460. Even so, the Supreme Court rejected the Bivens request because the Social Security Act provided a multi-step process for review of disability claims.
Wilson is even more to the point. The Privacy Act provided no relief for the claims of either Mr. or Mrs. Wilson against the three officers they sued for disclosing the fact of Mrs. Wilson’s CIA employment. The Act only offered a “possible claim” by Mrs. Wilson against a defendant not named in the lawsuit. Wilson, 535 F.3d at 709. Mr. Wilson had no cognizable claim under the Privacy Act against anyone because the only information disclosed by the defendants was his wife’s, meaning only she could bring a claim under the Act. Yet this court refrained from providing a Bivens remedy even to him because “the special factors analysis does not turn on *387 whether the statute provides a remedy to the particular plaintiff for the particular claim he or she wishes to pursue.” Id. Simply put, this will not be the first time we have rejected a Bivens request in light of a comprehensive statutory scheme that fails to provide for redress of a plaintiffs constitutional claims.
These precedents control the current case. The district court pointed to the CSRA’s lack of any review for Davis’s alleged constitutional violations as dispositive evidence that the CSRA cannot be considered a “comprehensive” remedial system. But Chilicky, Spagnola, and particularly Wilson are to the contrary. “[C]ase-speeifie analysis ... of the particular statutory remedies available to a claimant” is not required; instead, we look to whether the design of a statutory scheme evinces an informed congressional judgment that the remedies provided by the scheme are adequate. Spagnola, 859 F.2d at 227-28. If it does, the scheme’s failure to provide a remedy to a “particular plaintiff for the particular claim he or she wishes to pursue” does not make the scheme any less “comprehensive” for purposes of determining whether it is a special factor that precludes the creation of a Bivens remedy. See, e.g., Wilson, 535 F.3d at 709. The Wilson plaintiffs made a nearly identical argument, see id. at 707. It was as unavailing then as it is now. The Privacy Act’s failure to provide complete relief to the Wilsons did not “undermine its status as a ‘comprehensive scheme’ that stops us from providing additional remedies under Bivens.” Id. Just so, the CSRA’s lack of relief for Davis does not prevent it from being a “comprehensive remedial scheme” that precludes us from creating a Bivens remedy.
Davis contends that his complete lack of available remedies under the CSRA matters for a slightly different reason. He argues that Congress’s omission of any remedies for Library of Congress employees under the CSRA, while deliberate, does not demonstrate a considered judgment about which remedies should be available to those employees; rather, it shows that those employees are not “included in” or “covered by” the concededly comprehensive remedial system at all. This would mean he could still bring a Bivens action, he concludes, because a comprehensive remedial system cannot serve as a special factor barring creation of a Bivens remedy for employees who are not “covered” by that system.
This is not a novel theory. It has been framed before as the question “whether a particular claimant — and his underlying claim — should be included in a given congressional ‘comprehensive system’ for purposes of applying ‘special factors’ analysis.” Spagnola, 859 F.2d at 229. For instance, “while in some cases the outer boundaries for inclusion in ‘comprehensive systems’ may be less than clear,” there was “little doubt” that Congress had brought First Amendment claims like those advanced by the Spagnola plaintiffs “within CSRA’s ambit ... because the CSRA itself, in one fashion or another, affirmatively speaks to [claims like those] by condemning the underlying actions as ‘prohibited personnel practices.’ ” Id. This case is not materially different. Moreover, while the CSRA’s remedial scheme does not provide Davis with procedural protections (due to his status as a probationary employee of a non-Executive agency), it does provide procedural protections and rights of appeal for the specific underlying actions he challenges. See 5 U.S.C. §§ 4301-03 (providing certain protections to employees of “Executive agencies” removed for unacceptable performance, including advance written notice, a written decision, and the right to appeal to the Merit Systems Protection Board); id. *388 §§ 7512-13 (providing similar procedural protections and rights of appeal to employees against whom major adverse employment action is proposed). Both by definition and in substance, then, the CSRA accounts for civil-service members in Davis’s status. Congress may have then chosen to make the CSRA’s remedial protections for adverse employment actions unavailable to the subset of civil-service members of which Davis is a part, but he has provided us with no good reason to think that this choice is a signal to create a new Bivens remedy for that class of employees and not simply a considered congressional judgment that these remedies for these employees are not warranted.
Indeed, the only evidence Davis uses to suggest he is not “included” in the CSRA’s comprehensive remedial scheme is the lack of relief available to him under that scheme. As we have explained above, and as the precedents make clear, this is certainly not a sufficient reason to place a claimant and his claims outside the ambit of a comprehensive remedial scheme for purposes of special-factors analysis. See, e.g., Wilson, supra. In sum, the CSRA includes a comprehensive remedial scheme evincing a “considered judgment of Congress that certain remedies are not warranted,” Wilson, 535 F.3d at 709, including the damages remedy Davis seeks for alleged constitutional violations. As we must give “appropriate judicial deference” to that judgment, id., we decline to create a Bivens remedy and thereby contravene Congress’s choice.[1]
Conclusion
Because we hold that Davis has failed to state a Bivens claim for which relief may be granted, there is no reason to reach the merits of his claims or to consider whether Director Mulhollan is entitled to qualified immunity. We vacate the order of the district court denying Mulhollan’s motion to dismiss and remand with instructions to dismiss Davis’s Bivens claims.

. Davis can and has filed a claim for injunc-tive relief for the alleged constitutional violations. We express no view on the validity of that claim. See, e.g., Spagnola, 859 F.2d at 229-30.