# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 26, 2017        Decided February 6, 2018

No. 16-5045

STEWART LIFF AND STEWART LIFF & ASSOCIATES, INC.,
APPELLEES

v.

OFFICE OF INSPECTOR GENERAL FOR THE U.S. DEPARTMENT
OF LABOR, ET AL.,
APPELLEES

DANIEL PETROLE, FORMER INSPECTOR GENERAL OF THE
OFFICE OF THE INSPECTOR GENERAL FOR THE U.S.
DEPARTMENT OF LABOR, IN HIS INDIVIDUAL AND/OR OFFICIAL
CAPACITIES, ET AL.,
APPELLANTS

———

Consolidated with 16-5370

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cv-01162)

———

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice,
argued the cause for appellants. With him on the briefs was

*Michael S. Raab*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Paul Y. Kiyonaga* argued the cause and filed the briefs for plaintiffs-appellees.

Before: GARLAND, *Chief Judge*, and PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge:* Stewart Liff runs a human resources consulting business that contracts with various government and private clients – or he did, he alleges, prior to the reputational injury caused by scurrilous reports from the Office of Inspector General for the Department of Labor ("DOL-OIG") and the Office of Personnel Management ("OPM"), disseminated by government officials and publicized by the Washington Post. Liff, individually and through his consulting business, Stewart Liff & Associates, Inc., sued DOL, DOL-OIG and OPM alleging violations of his due process rights and the Administrative Procedure Act. Liff asserted a claim for damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that individual officers – acting DOL Inspector General Daniel Petrole, DOL Deputy Secretary Seth Harris, and OPM Director John Berry (collectively, "the *Bivens* Defendants" or "Defendant-Appellants"), as well as two unknown agents – violated his constitutional rights under the Due Process Clause of the Fifth Amendment by issuing erroneous reports that damaged Liff's reputation, barred him from future government contracts, and deprived him of his liberty interest in pursuing his chosen profession.

Defendants filed a motion to dismiss, in which Defendant-Appellants Petrole, Harris, and Berry moved to dismiss Liff's *Bivens* claim on the basis that alternative remedies were available to protect his constitutional interest and on qualified-immunity grounds, arguing that they had violated no clearly established constitutional right. The District Court denied the motion as to the *Bivens* Defendants, reasoning that it was "premature" to decide whether a *Bivens* remedy was available and rejecting Defendant-Appellants' assertion of qualified immunity. The agencies and the *Bivens* Defendants sought reconsideration of other aspects of the District Court's decision. The *Bivens* Defendants then appealed the District Court's initial decision on the motion to dismiss, asserting that it was error not to decide the availability of a *Bivens* remedy and that they were entitled to qualified immunity.

We reverse. The District Court should have decided the availability of a *Bivens* remedy as a threshold question gating whether the *Bivens* Defendants must defend against this suit in their personal capacities. Reviewing that question of law directly, we conclude that no *Bivens* remedy is available for Liff's claims. Congress has provided significant remedies for disputes between contractors and the government entities that engage them, as well as for persons aggrieved by the government's collection, maintenance, and dissemination of information. In light of these alternative remedies and the comprehensive remedial schemes they represent, we decline to extend a *Bivens* remedy for Liff's claims.

## Background

We accept as true the well-pleaded allegations of the Complaint for the purpose of this appeal, as did the District Court. *See Davis v. Billington*, 681 F.3d 377, 379 (D.C. Cir. 2012); *Wilson v. Libby*, 535 F.3d 697, 701 (D.C. Cir. 2008).

Liff is a "nationally-recognized consultant . . . on human resources management issues." Compl. I. After retiring from a career in the Department of Veterans Affairs ("VA"), Liff opened a consulting firm called Stewart Liff & Associates and began providing training and resources on management issues for various government entities. His clients included the VA, the Departments of Labor, Defense, Agriculture, and Treasury, OPM, the State of Georgia, and the World Bank. Compl. ¶¶ 15-16. Some 90% of Liff's consulting and training work was for federal agencies. Compl. ¶ 18.

In 2009, Liff was hired as a subcontractor to provide consulting services to the Department of Labor Veterans' Employment and Training Service ("DOL-VETS"), after Assistant Secretary of Labor Ray Jefferson directed agency contracting staff to look into procuring Liff's services. Compl. ¶¶ 20-22. Liff alleges that Jefferson requested that DOL-VETS staff Angela Freeman and Paul Briggs "determine whether Liff could be hired to provide consulting services, in accordance with the law and applicable ethical principles." Compl. ¶ 21. DOL-VETS eventually hired Liff as a subcontractor through contractors For Your Information, Inc. and MSTI, Inc. Compl. ¶¶ 22-23. Liff's work for DOL-VETS included three "management assessment reports" on topics including "program development methods and processes," union relations, "visual management strategies at DOL-VETS to boost employee performance," and ways to improve the tracking and evaluation of agency programs. *See* Compl. ¶¶ 26-29.

The events giving rise to Liff's claim begin with "an expanded version of the first management assessment report" suggesting changes to the DOL-VETS office. Compl. ¶¶ 32-33. Following complaints from DOL-VETS employees

Freeman and Briggs about Liff's report, DOL-OIG began an investigation into Liff's services. Under acting Inspector General Petrole, DOL-OIG issued a report in July 2011, which concluded that DOL-VETS improperly hired Liff under pressure from Jefferson. Compl. ¶ 38. The DOL-OIG report bore a banner stating that "[the report] and its contents are not to be distributed outside of [the] agency." Compl. ¶ 39 (emphasis omitted). However, the report eventually was posted publicly on the internet, and the Washington Post published an article in which "Liff was a central focus." Compl. ¶¶ 39, 45. Liff alleges that the report and related publicity included "blatant misstatements and false characterizations," including about Liff's relationship with Jefferson, about Liff's timekeeping practices, that one of Liff's "key roles . . . was that of a quasi interior designer 'picking colors,'" that Liff was paid some $700,000 for his consulting work, and that Liff worked on a "secret report" for Jefferson, "thereby suggesting that Liff had engaged in illicit, unethical activities." Compl. ¶ 42.

After this information became public, Deputy Secretary Seth Harris issued a memorandum which "prais[ed] DOL-OIG for its report and set[] forth concrete follow-up actions" including a "vow[]" to "'aggressively pursue' Liff for 'all valid causes of action.'" Compl. ¶ 48. Liff "was not apprised of these specific allegations" before Harris issued the memorandum and "thus did not have an opportunity to meaningfully respond." *Id.* Like the DOL-OIG report, Harris's memorandum was posted online. *Id.*

Liff also worked with OPM. In July 2011, Liff learned that the Office of the Inspector General for OPM ("OPM-OIG") "had initiated an investigation into how Liff's services as a subcontractor to OPM . . . had been arranged." Compl. ¶ 47. In August 2011, OPM "terminat[ed] the task order under

which Liff was providing human resources management consulting," for which Liff expected to be paid an outstanding amount of "approximately $350,000." *Id.* Liff did not receive "any prior notice" of this termination "or opportunity to meaningfully address" the underlying "negative characterizations of [his] work." *Id.*

In early 2012, Liff participated in an interview with an OPM-OIG special agent. Compl. ¶ 49. Liff understood this interview to be part of an investigation in which he would be a witness. *Id.* On April 2, 2013, OPM-OIG issued a report which "posited, without adequate support, that Liff's services may have been 'wasteful' of taxpayer resources as proper procurement procedures for his services had not been used." *Id.* The next week, OPM Director Berry made public statements disclaiming any future use of Liff's services. In particular, Berry wrote a publicly released letter to OPM-OIG that stated that "he had taken steps to 'ensure that OPM immediately concluded any business involving Stewart Liff & Associates, Inc.'" Compl. ¶ 50. Berry also commented in a press conference that OPM would not use Liff's consulting services again. Because OPM "provides consulting services through interagency agreements to some 150 other federal agencies and entities," OPM's decision not to use Liff's services "contributed significantly to a broad preclusion of Liff from future government consulting opportunities." *Id.*

Liff alleges that the actions of DOL-OIG, OPM, and the individual government officers involved have "broadly precluded" him "from securing work in the federal sector as a consultant or teacher" and that "many of [his] contacts in government – key sources of potential work or referrals – stopped returning his calls." Compl. ¶ 52. In addition, he "submitted competitive bids on a variety of government contracts . . . but with one exception, has not been selected for

any project." *Id*. He has "attempted since July 2011 to 're-brand' himself as a human resources expert for private companies, to little effect," purportedly because of the deleterious information publicly available as a result of the DOL-OIG and OPM reports. Compl. ¶ 55.

## Procedural History

The *Bivens* Defendants moved to dismiss the complaint, arguing that there was no *Bivens* remedy for the reputational harm that Liff alleged, that alternative remedies enacted by Congress precluded judicial recognition of a *Bivens* remedy, and that recognizing a *Bivens* action in this context would chill speech by government officials. They also asserted a qualified-immunity defense, contending that the alleged actions violated no clearly established constitutional right. In addition, Defendants argued that Liff's constitutional claims were untimely, as the analogous District of Columbia statute of limitations had expired.

The District Court denied the motion as to the *Bivens* Defendants. The District Court noted the argument that no *Bivens* remedy was available, but declined to decide the issue, explaining that it would await factual development because it "appear[ed] both ill advised and premature to pronounce on the availability of a *Bivens* remedy before deciding the threshold question of whether a due-process violation ha[d] transpired." *Liff v. Office of the Inspector Gen. for the U.S. Dep't of Labor*, 156 F. Supp. 3d 1, 18-19 (D.D.C. 2016). Turning to the qualified-immunity issue, the District Court concluded that Liff's complaint sufficiently alleged that actions taken by Harris, Petrole, and Berry interfered with Liff's right to pursue his chosen profession, both through *de facto* debarment from contracting with OPM, as effected by Berry, and through the "broad effect" of Harris's and Petrole's actions with respect to

the DOL-OIG report. *Id*. at 19-20. The District Court then found that the right was "sufficiently clear" to defeat the *Bivens* Defendants' qualified-immunity defense at the motion-to-dismiss stage. *Id*. at 21.

Defendants moved for, and were granted, reconsideration on the statute-of-limitations question, which the District Court had declined to decide in the first instance. Defendants did not seek reconsideration with respect to the *Bivens* and qualified-immunity issues. Instead, the *Bivens* Defendants appealed those holdings for our interlocutory review.

**Discussion**

**I.**

Defendant-Appellants seek this Court's review of the District Court's denial of their motion to dismiss on qualified-immunity grounds. The collateral-order doctrine permits immediate appellate review of "a limited set of district-court orders" that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself" to justify delay. *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (quotation marks and citation omitted). A district court's denial of a qualified-immunity claim is one such exception "because qualified immunity . . . is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation.'" *Id*. at 672 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Because the "defense of qualified immunity from a *Bivens* damages action directly implicates the antecedent question whether to recognize that *Bivens* action at all," *Davis*, 681 F.3d at 380 (quotation marks omitted), that question is appropriate for interlocutory appeal. *See Iqbal*, 556 U.S. at 673 (explaining the collateral-order posture of the

*Bivens* issue in *Wilkie v. Robbins*, 551 U.S. 537 (2007)); *Doe v. Rumsfeld*, 683 F.3d 390, 393 (D.C. Cir. 2012).

We review *de novo* the District Court's legal conclusions denying a motion to dismiss. *Davis*, 681 F.3d at 380. "[W]e, like the district court, accept as true the well-pleaded factual allegations of the complaint." *Id*. at 379.

## II.

We begin with the availability of a *Bivens* remedy. The District Court declined to rule on this question; however, it is appropriate to determine the availability of a *Bivens* remedy at the earliest practicable phase of litigation because it is "'antecedent' to the other questions presented," *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017).

In considering the availability of a *Bivens* remedy, we first look for "an 'alternative, existing process' capable of protecting the constitutional interests at stake." *Minneci v. Pollard*, 565 U.S. 118, 125 (2012) (citing *Wilkie*, 551 U.S. at 550); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017) (noting that "an alternative remedial structure . . . alone may limit the power of the Judiciary to infer a new *Bivens* cause of action"). "[A] remedial statute need not provide full relief" to prompt judicial deference because the touchstone is "who should decide whether such a remedy should be provided." *Wilson*, 535 F.3d at 705 (quoting *Bush v. Lucas*, 462 U.S. 367 (1983)). "The answer most often will be Congress," *Ziglar*, 137 S. Ct. at 1857, and "[w]hen the design of a [remedial scheme] suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations," courts decline to create additional remedies. *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988); *see also Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1988) (explaining that "courts must

withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has 'not inadvertently' omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies").

Under this rationale, the Supreme Court has declined to extend *Bivens* where Congress has provided at least a partial remedy via statute, *see Bush*, 462 U.S. at 388 (federal employment law); *Chilicky*, 487 U.S. at 424 (Social Security); *Wilkie*, 551 U.S. at 550 (various statutes), as well as where other causes of action provide redress, *see Minneci*, 565 U.S. at 120 (state tort law); *Ziglar*, 137 S. Ct. at 1865 (habeas or other equitable relief). *Cf. Bivens*, 403 U.S. at 394 ("The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile."). This Court itself has recognized alternative remedial schemes precluding *Bivens* actions in the context of the Civil Service Reform Act, Title VII of the Civil Rights Act of 1964, the Freedom of Information Act, the Veterans' Judicial Review Act, and the Privacy Act. *See Wilson*, 535 F.3d at 706 (collecting cases).

Where no alternative remedy is available, courts exercise judgment regarding the propriety of extending a judicial remedy, "paying particular heed . . . to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 550 (quoting *Bush*, 462 U.S. at 378). Courts must conduct a "special factors" analysis when considering "new" *Bivens* remedies – that is, *Bivens* claims in cases with "meaningful enough" differences from previously recognized contexts, *see Ziglar*, 137 S. Ct. at 1859.

## III.

Defendant-Appellants assert that many and various statutes and regulations provide alternative remedies that block Liff's *Bivens* action. Before considering the substance of those remedies, we first address whether we should evaluate the full scope of alternatives as presented in this appeal. Liff argues that Defendant-Appellants' reliance on the Privacy Act, among other remedial statutes, was not argued before the District Court and therefore is not properly presented.

"It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (citation omitted). This rule embodies the principle that litigants should not be surprised by a decision without having had an opportunity to address the issue being decided. *Id*. However, courts of appeals have discretion to resolve issues not raised in or decided by the district court, as may be justified by the facts of individual cases. *Id.* at 121. This Court has exercised this discretion in various "exceptional cases or particular circumstances," including where the issue presents "a novel, important, and recurring question of federal law," or where the new argument relates to a threshold question such as the clear inapplicability of a statute. *See Lesesne v. Doe*, 712 F.3d 584, 588 (D.C. Cir. 2013) (citation omitted). The Court also has found it appropriate to resolve issues not raised in the district court where the case "involves a straightforward legal question, and both parties have fully addressed the issue on appeal." *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 686 (D.C. Cir. 2010); *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992) (exercising discretion to address an issue first raised on appeal because "the issue is purely one of law important in the administration of federal justice, and resolution of the issue does not depend on any additional facts

not considered by the district court"). For example, in *Lesesne v. Doe*, the Court interpreted on appeal whether the Prison Litigation Reform Act's exhaustion requirement applied to certain claims, "a dispositive legal issue antecedent to [the statute's] application." *Lesesne*, 712 F.3d at 588. In *Prime Time International Co. v. Vilsack*, the Court reversed the district court's grant of summary judgment, concluding that a legal issue raised for the first time on appeal was a dispositive defense. *Prime Time*, 599 F.3d at 686. In appropriate circumstances, this approach avoids unnecessary expenditure of judicial resources and expedites final resolution of the parties' dispute.

Even assuming that Defendant-Appellants did not identify below some of the specific remedial mechanisms advanced here, we exercise our discretion to consider those arguments. The question of the availability of a *Bivens* remedy in light of the broader statutory scheme is an issue of law, and the parties have addressed it extensively in their briefing before this Court. Our *de novo* review of the District Court's decision underscores this point: the parties had every incentive to put their best foot forward with respect to all legal issues presented on appeal, given that we would start anew in evaluating their arguments and deciding the law – and they did so. We note also that the posture of this issue defeats the usual forfeiture analysis. While Defendant-Appellants did not extensively argue below the full breadth of alternative statutory schemes that they now advance, the additional bases upon which they now rely further the argument that they did put forward: claims like Liff's are covered by other remedial systems that Congress has implemented, which block a *Bivens* action regardless of whether they are adequate to provide all of the relief he seeks. In that sense, the additional statutory bases asserted here constitute further support of Defendant-Appellants' argument below. *See Koch v. Cox*, 489 F.3d 384, 391 (D.C. Cir. 2007)

(invocation on appeal of regulatory basis for previously asserted argument did not raise new issue). With respect to the Privacy Act argument in particular – where Liff most vociferously asserts forfeiture – we note that Defendant-Appellants cited *Wilson v. Libby* in their brief on the motion to dismiss for the proposition that "the existence of a comprehensive statutory scheme addressing the subject matter of the lawsuit" is a special factor that "frequently precludes a *Bivens* remedy." *See Liff v. Office of the Inspector Gen. for the U.S. Dep't of Labor*, Mot. to Dismiss, ECF No. 17 (May 11, 2015); JA73. If nothing else, that precedent denying a *Bivens* remedy in light of the Privacy Act indicated the Act's relevance.

We turn now to the various remedies that Defendant-Appellants argue preclude a *Bivens* remedy. The constellation of statutes and regulations governing federal contracts, as well as the Privacy Act, provide a remedy for Liff's claims. And, to the extent that these statutes leave gaps in the remedies available to Liff, the presence of significant legislated remedies in this arena counsels against the recognition of a judicially created *Bivens* remedy.

## A.

Many of Liff's asserted harms relate to his purported inability to obtain government contracts – at least, his inability to obtain contracts as frequently as he used to, as Liff has won at least one bid since the events upon which he bases his Complaint. Defendant-Appellants identify myriad statutes and regulations that provide remedies for contracting-related disputes, which they allege would encompass many of Liff's asserted harms. These include the Tucker Act, which provides a cause of action in the Court of Federal Claims and in district courts for an interested party to object to an agency's

solicitation of bids or proposed award or award of a contract for "any relief that the court considers proper," 28 U.S.C. § 1491(b); the Federal Acquisition Regulation, which establishes procedures for agency procurement protests, 48 C.F.R. § 33.103; the procurement protest system, which offers mechanisms by which a losing bidder may protest the award of a contract in violation of a statute or regulation, 31 U.S.C. § 3551 *et seq.*; and the Contract Disputes Act, which enables contractors to submit a claim to a federal contracting officer regarding disputes over the administration of a current contract, 41 U.S.C. § 7103. These provisions each provide some nature of remedy for government contractors aggrieved by contracting decisions and administration.

We do not parse the specific applicability of this web of contracting-related remedies in Liff's circumstances, but instead note the spectrum of remedies they provide. Some, like the Contract Disputes Act, relate to contracts already underway, while others, like the Tucker Act, provide for challenges at earlier stages of government contracting, including when an agency first determines to solicit bids for a project. They also provide remedies for reputational debarment claims like Liff's, to the extent that official findings or reports are relied upon in later government contracting decisions. For example, in *NCL Logistics Co. v. United States*, a would-be contractor brought a Tucker Act claim after being rejected for a contract due to a finding that it was "nonresponsible" – that is, that the contractor had an inadequate record of performance. 109 Fed. Cl. 596 (Fed. Cl. 2013). The court considered the contractor's challenge to the responsibility determination as based on flawed assumptions and incomplete evidence, as the finding precluded the contractor from winning the contract. *Id*. at 622-26. Similarly here, if contracting entities relied on the DOL-OIG and OPM

reports to deny Liff's bids for contracts, he could have challenged that reliance under the contracting statutes.

Liff rejects these various remedies as inapt, as he "is not making a bid protest, contesting a contract award or challenging the administration of a contract," *see* Appellee's Br. 29 – all claims he does not deny could be brought under these various contract-related provisions. But it makes no difference, for the purpose of our analysis and the availability of a *Bivens* remedy, that Liff has framed claims that "are manifestly not contract actions," *id*. at 30. *Cf. A & S Council Oil Co., Inc. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (evaluating applicability of government contracting statutes and noting that "plaintiffs' claim that the wrong originated in some statutory violation does not strip the case of its contractual character"). Clearly, Liff alleges injury outside of what may arise in contract: his asserted damages, for instance, go beyond the contracts that he claims he lost as a result of his alleged reputational harm. It is equally clear, however, that lost contracts are an inherent piece of the bigger picture. Liff himself alleges as much, including in his *Bivens* claim his loss of "his legitimate expectation of income from the OPM task orders/contract," for example. Compl. ¶ 82. Moreover, if Liff lost no contracts – if business continued as usual for Liff and his consulting firm – he presumably would not have brought this suit. But assuming as true Liff's allegations that he did in fact lose contracts, as we must at this phase in the litigation, these contracting statutes and regulations provide him recourse with respect to those losses.

It also makes no difference if the contract-based remedies would not provide a full remedy for Liff. The question is whether alternative remedies exist, not whether they cover the full breadth of harm that a would-be *Bivens* plaintiff alleges. Even if gaps remain in the overlapping and extensive

contracting remedies, Congress's activity in this area counsels against a judicially created *Bivens* remedy. *See Chilicky*, 487 U.S. at 423. We see no indication that Congress "inadvertently" omitted remedies excluded from this remedial scheme or otherwise intended for the courts to take it upon themselves to extend additional remedies. *See Spagnola*, 859 F.2d at 228. Accordingly, judicial recognition of a *Bivens* remedy is not appropriate in light of the existence of this "comprehensive remedial scheme." *See Wilson*, 535 F.3d at 705. Other courts to consider this question similarly have held that the extensive remedies for disputes arising from government contracts preclude a *Bivens* action in this arena. *See M.E.S., Inc. v. Snell*, 712 F.3d 666, 672 (2d Cir. 2013) (rejecting *Bivens* remedy where "plaintiff's constitutional claims originate in contract obligations for which the comprehensive procedural and substantive provisions of the [Contract Disputes Act] afford meaningful – and exclusive – remedies against the United States"); *Evers v. Astrue*, 536 F.3d 651, 659 (7th Cir. 2008) (no *Bivens* remedy for denied renewal of contract and rejection of other bids); *Janicki Logging Co. v. Mateer*, 42 F.3d 561, 565 (9th Cir. 1994) (no *Bivens* action for cancellation of contract); *see also Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 404 (2d Cir. 2015) (no *Bivens* remedy for subcontractor due to Contract Disputes Act, applying special factors analysis).

Of course, it may not always be the case that the particular nature of the constitutional harm that a contractor alleges is sufficiently connected to the contracting relationship between the contractor and the government such that this particular remedial scheme precludes judicial recognition of a *Bivens* remedy – in fact, Liff's allegations about potentially rights-implicating statements by the *Bivens* Defendants arguably present one such example, discussed below. *Cf. Evers*, 536 F.3d at 659 (explaining the "closer case" where government

officials "defamed [the contractor] by making negative false statements to third parties," which may allege a claim sounding in tort). We do not pass upon other hypotheticals. But as to Liff's alleged injuries related to his ability to successfully bid for and secure government contracts, the congressionally created system for government-contract adjudication precludes judicial extension of further remedies.

**B.**

As noted, Liff's allegations do not all fit tidily within the contract-related statutes and regulations that preclude his *Bivens* action. Beyond Liff's assertion that he is now unable to obtain government contracts, Liff also alleges that reputational damage from the reports of which he complains has impeded his career in private contracting. Liff's allegations that government officials disseminated information that harmed Liff's reputation find an alternative remedy in the Privacy Act, which precludes his requested *Bivens* remedy.

The Privacy Act "regulate[s] the collection, maintenance, use, and dissemination of information by [Federal] agencies." *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). The Act requires that agencies "maintain . . . only such information about an individual as is relevant and necessary" for agency purposes, 5 U.S.C. § 552a(e)(1), including "all records which are used by the agency in making any determination about any individual." *Id.* § 552a(e)(5). Agencies also must "make reasonable efforts to assure that [records about an individual] are accurate, complete, timely, and relevant for agency purposes," before the agency "disseminat[es]" such records. *Id.* § 552a(e)(6). The Privacy Act provides a statutory right for a person to review the contents of government records about them and seek correction "of any portion thereof which the

individual believes is not accurate, relevant, timely, or complete." *See id.* § 552a(d). An individual can sue in federal court if an agency denies their request to review records or

> fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual.

*Id.* § 552a(g)(1). The Privacy Act also offers relief for some claims based on the government's information that is not "within a system of records." *McCready v. Nicholson*, 465 F.3d 1, 11 (D.C. Cir. 2006) (quotation marks omitted). *McCready* illustrates that the Privacy Act encompasses misstatements contained in a disparaging Inspector General's report and associated agency documents. *Id.* at 11-14. The Privacy Act also applies when an "adverse determination 'is made'" by the agency that maintained the flawed record or by an outside actor. *See Dickson v. Office of Pers. Mgmt.*, 828 F.2d 32, 36-37 (D.C. Cir. 1987). Injunctive relief and monetary damages are available. 5 U.S.C. § 552a(g)(2) & (4).

This Court and others have recognized the Privacy Act as an alternative remedial scheme precluding a *Bivens* remedy in other contexts. In *Wilson v. Libby*, for example, which Defendant-Appellants cited before the District Court and rely upon on appeal, this Court concluded that the Privacy Act constitutes a legislated remedy, blocking a *Bivens* action over the improper disclosure by government officers of the identity of CIA operative Valerie Plame, which hindered her career. 535 F.3d at 709. *See also Chung v. U.S. Dep't of Justice*, 333

F.3d 273, 274 (D.C. Cir. 2003) (affirming the dismissal of *Bivens* action based on leaks of private information by government officials because those claims were "encompassed within the remedial scheme of the Privacy Act"). Likewise, in *Abdelfattah v. U.S. Department of Homeland Security*, we affirmed that the Privacy Act precluded a *Bivens* action challenging the collection and maintenance of intelligence information in a Department of Homeland Security database. 787 F.3d 524, 534 (D.C. Cir. 2015). While the *Abdelfattah* plaintiff could seek expungement as equitable relief for violations of the Constitution, as well as the Privacy Act, the Court denied the availability of a *Bivens* damages claim arising from the same constitutional claims. *Id.* at 534-35. The Sixth Circuit has similarly held that the Privacy Act's "meaningful remedy" for claims arising from government records precludes a *Bivens* remedy, *Downie v. City of Middleburg Heights*, 301 F.3d 688, 696 (6th Cir. 2002), and the Fourth Circuit has suggested the same. *See Chesser v. Chesser*, 600 F. App'x 900, 901 (4th Cir. 2015) (citing *Wilson*, 525 F.3d 697, and *Downie*, 301 F.3d 688).

Liff argues scattershot that the Privacy Act cannot preclude a *Bivens* remedy because, he asserts, the record is undeveloped about whether there are records about him to which the Privacy Act applies; his claims "go far beyond a mere 'disclosure' of record information"; he could not challenge his OPM debarment under the Privacy Act; the Privacy Act does not deter individual government officials; and only individuals, not corporations, can sue under the Privacy Act. These arguments all boil down to one: the Privacy Act does not provide a complete remedy for the injury Liff alleges. Even assuming these limitations, Liff's position is unpersuasive. As described above, it makes no difference in our *Bivens* inquiry whether the remedy that Congress has provided is complete in the sense that it makes a party whole

for the injury asserted. Our prior cases rejecting a *Bivens* remedy in light of the Privacy Act confirm this principle. *See Wilson*, 535 F.3d at 707 (although "three defendants in this case are exempted," "[t]he failure of the Privacy Act to provide complete relief . . . does not undermine its status as a 'comprehensive scheme' that stops us from providing additional remedies under *Bivens*"); *Griffin v. Ashcroft*, No. 02-5399, 2003 WL 22097940, at *1 (D.C. Cir. Sept. 3, 2003) (no *Bivens* remedy despite regulation providing that "inmate records systems are exempt from the [Privacy Act's] amendment provision"). The Privacy Act represents Congress's legislative judgment about the appropriate remedies with respect to the accuracy, fairness, and use of government information, and the judicial system is not in a position to revise that scheme by recognizing an additional constitutional remedy for that kind of claim.

We accordingly conclude, as we have before, that the Privacy Act inhibits the availability of a *Bivens* remedy with respect to the information about Liff in the reports and public statements on which he bases his claim.

## IV.

Defendant-Appellants assert that the District Court erred in denying their qualified-immunity defenses. Because we have determined that Liff has no viable *Bivens* action against Defendant-Appellants, we need not consider their qualified-immunity defenses. *See, e.g.*, *Doe*, 683 F.3d at 397.

## Conclusion

For the forgoing reasons, we reverse the District Court's denial of the *Bivens* Defendants' motion to dismiss.